Filed 7/2/21  J.M. v. Superior Court CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| J.M., et al.,<br><br>     Petitioner,<br><br>v.<br><br>THE SUPERIOR COURT OF MARIN COUNTY,<br><br>     Respondent;<br><br>MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>     Real Party in Interest. | A162235<br><br>(Marin County<br> Super. Ct. No. JV26977A) |

In these juvenile writ proceedings, J.M. (father) and H.P. (mother) seek extraordinary relief from the juvenile court order setting a permanency planning hearing for their son, E.M., pursuant to section 366.26 of the Welfare and Institutions Code.[1]  The parents contend there was insufficient evidence to support the juvenile court's findings that the Marin County Department of Children and Family Services (Department) provided reasonable services and made active efforts to prevent the breakup of their Indian family as required by the Indian Child Welfare Act of 1978 (25 U.S.C. § 1901 et seq.; ICWA).  Seeing no error, we deny the petitions.

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise specified.

# I.  BACKGROUND

## A.    *Investigation and Detention*

E.M. first came to the attention of the Department at the age of two, after a report alleging the minor was seen by hotel staff on June 8, 2020wandering alone in a parking lot and near high traffic areas of Corte Madera.  Father later admitted the minor left the hotel room while he was sleeping.  On June 12, E.M. was again found wandering around the hotel parking lot in Corte Madera, this time late at night, alone, naked, and in distress.  Mother was discovered passed out in a hotel room containing heroin, cocaine, needles, and other drug paraphernalia within reach of the minor.  Father was at work but returned to take custody of E.M. after mother was arrested on child endangerment and possession charges.

Father, an electrician at a local automobile manufacturer, told the social worker he was unaware mother was using drugs and had not seen any drug paraphernalia around the hotel room.  Father explained he had met mother about four years ago while working in Alaska.  After he relocated to Hawaii for a job, mother joined him.  Several months later, father discovered that mother was using methamphetamine.  Mother participated in both inpatient and outpatient drug treatment for six months and graduated from the program about three years ago.  Father believed she had remained sober since then.  E.M. was born approximately a year after mother completed treatment.

The family moved to Oakland in early 2020 after father obtained employment with a nonprofit organization.  Father lost his job when the nonprofit closed in March 2020 due to the COVID-19 pandemic, and he was unemployed until May 2020 when he was hired into his current position working the night shift from 10:00 p.m. to 6:00 a.m.  The family's finances

deteriorated during this stressful period, and they found housing through Project Roomkey, a state program that supports people with housing instability caused by the pandemic. Father denied any history or current use of drugs and stated he would do anything to keep E.M. safe.[2]

Mother spoke with the social worker by telephone and stated that father had asked her to leave the family home and that she understood she should not care for E.M. alone. Mother reported she had been sober for the " 'past couple of years.' " The social worker offered to help her get into a substance abuse treatment program. On June 15, 2020, the social worker spoke with father and a family friend who had agreed to watch E.M. while father was working. On June 19, father confirmed that mother was living outside the home and his friend was watching E.M. at night.

Both parents indicated they would sign a written safety plan prepared by the social worker to ensure that E.M. was always supervised by a safe and sober caregiver. Although the social worker e-mailed the plan to the parents on June 12 as agreed, they did not respond to the e-mail or return a signed agreement. Mother subsequently failed to respond to the social worker's numerous phone calls. Father agreed to participate in a second in-person safety planning meeting scheduled for June 23, but never returned the social worker's calls or voicemails when she called to confirm.

The Department received another report on June 25, 2020 that E.M. was found on multiple occasions wandering unsupervised in a different hotel parking lot in Newark. A hotel guest had observed E.M. locked alone in a parked car for approximately 30 minutes, and hotel staff had stopped the minor from running into a busy intersection. After law enforcement was

---

[2] As described below, portions of father's account are contradicted by other reports later obtained by the Department.

called, father stated he was sleeping during these incidents and thought E.M. was sleeping with him. Father checked out of the hotel soon after speaking with the police. From June 25 to June 29, father refused to meet with the social worker or produce the minor, both parents failed to respond to the social worker's repeated phone calls and texts, and the whereabouts of the family were unknown. The social worker attempted to contact the family friend who had been helping care for E.M., but the number had been disconnected.

On June 26, 2020, the Department spoke with the maternal grandmother and learned that mother had a long history of substance abuse. Mother's two oldest children came to the attention of child welfare and tribal authorities in Alaska as toddlers due to mother's substance abuse and neglect and were placed in the care of the maternal grandmother. Mother's third child was also not in mother's care due to substance abuse and neglect and resided with his paternal grandparents.

According to the maternal grandmother, E.M. had been detained at birth by Hawaii child welfare services after mother tested positive for a controlled substance during delivery. The minor was in foster care for several months before mother entered a family residential substance abuse treatment center in December 2017. The maternal grandmother stated that father also had a history of substance abuse and dealt drugs in both Hawaii and Alaska. A women's shelter in Hawaii eventually flew mother and E.M. to Alaska to separate them from father, but he found them and they all relocated to California together. Mother reportedly relapsed in August 2019. The maternal grandmother expressed interest in placement of E.M. and told the social worker to contact the Orutsararmiut Native Counsel (ONC) so that the tribe could coordinate the minor's move to Alaska if he was detained.

4

The Department contacted Marie Dorris, the social services director for the ONC, on that same day to report E.M.'s possible detention. Ms. Dorris stated that mother was an enrolled citizen of the ONC and that the minor, while not registered, was eligible for membership. This information was confirmed by the maternal grandparents, the maternal grandfather being an ONC council member. On June 29, the Department spoke with Ms. Dorris and another ONC representative, who agreed with E.M.'s detention and participation in the court process. Although the tribe intended to take over jurisdiction of the case, they could not immediately travel from Alaska to transport the minor due to the COVID-19 pandemic. In the meantime, the social worker offered to seek assistance from the Federated Indians of Graton Rancheria for help in locating an ICWA-compliant home as Marin County is in Graton Rancheria's ancestral territory. On that same day, the social worker provided father with a list of Native American services in the area, including Tribal TANF of Sonoma and Marin and Sonoma County Indian Health Services. A similar letter listing an assortment of Native American resources was provided to mother several days later.

E.M. was finally located on June 29, 2020, after extensive efforts by the social worker. Given the parents' evasive behaviors and lack of responsiveness with the Department, as well as the ongoing concern that the minor was at imminent risk of serious physical harm while in their care, E.M. was placed into protective custody. On July 1, the Department filed a dependency petition, alleging that E.M. was a minor described by subdivisions (b)(1) and (j) of section 300. The social worker facilitated a virtual visit between E.M. and his parents that same day.

The minor was formally detained by the juvenile court on July 7, 2020. At the detention hearing, father was elevated to presumed father and the

5

court ordered services for the parents, including drug testing, substance abuse treatment, and parenting education. Ms. Dorris from the ONC addressed the court regarding efforts to identify a relative placement, and the juvenile court found there was reason to know E.M. was an Indian child. Based on its review of the record, the juvenile court found that the Department had made active efforts to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family, but that those efforts were unsuccessful.

## B. *Jurisdiction and Disposition*

In advance of the combined jurisdictional and dispositional hearing, the Department filed reports informing the court that E.M. was residing in an ICWA-compliant foster home. Mother had reportedly called the tribal enrollment office to enroll E.M. as a member of the tribe and was awaiting a response. The Department was in frequent communication with Ms. Dorris from the ONC. It was exploring placement with an aunt in Alaska, which the ONC approved. In addition, the Department was attempting to facilitate phone/video communication between E.M. and his maternal grandmother, aunts, and half siblings in Alaska with the help of the foster family and the ONC.

The Department had also confirmed with child welfare services in Hawaii that E.M. was taken into protective custody due to concerns regarding mother's long history of addiction and her positive test for methamphetamine when the minor was born. Family reunification services had been provided for both parents, including parenting education, drug testing, and substance abuse assessment and treatment. Mother entered and completed treatment, E.M. was returned in January 2018, and the case was closed in October 2018 after a period of family maintenance services. As for

6

mother's three older children, there were seven referrals to child welfare services in Alaska dating back to 2010, all related to alleged neglect due to substance abuse. Allegations included neglect, mother's abuse of OxyContin and heroin, repeated public intoxication, and domestic violence.

Father reportedly had a criminal history in California dating back to 1986, including approximately 12 convictions from 9 separate counties. Father's most recent conviction was in 2012 for felony possession of a controlled substance. Criminal histories were not obtained from other states for either parent.

After numerous failed attempts to contact the parents by phone, text message, and e-mail, the social worker spoke with them on July 27, 2020 via video chat. Mother indicated she had been sober since the day of her arrest and was using methadone to help with withdrawal. She was open to entering residential treatment if recommended by the Department. Father emphasized that they would do anything they needed to do to get the minor back. The social worker noted that the parents' lack of consistent communication with the Department made it difficult to fully assess the family's needs but that it would continue to make active efforts to refer mother to "services that are culturally relevant, taking into account her Native American heritage." Indeed, although mother could have been bypassed for services given her long history of drug use and resistance to prior treatment, the Department recommended that services be provided to both parents in an attempt to preserve the Indian family. This was also the ONC's preference.

The Department, after input from both parents and the tribe, recommended a case plan for mother establishing goals of building a support network, staying free of illegal drugs, and showing her ability to live free of

7

drug dependency. The case plan called for Mother to submit to weekly drug testing, participate in weekly visitation with E.M., and complete a residential drug treatment program and any recommended follow-up care. The Department, in turn, was charged with assisting mother in accessing a drug treatment program that was culturally relevant to her Native American heritage and otherwise supporting her in her service objectives. As for father, the Department recommended a case plan with goals of consistently and appropriately parenting E.M. and building a support system to help ensure the minor's safety at all times. Father was required to participate in virtual parenting classes, visit weekly with the minor, and drug test weekly.

The Department additionally filed an expert declaration from Percy Tejada, which was provided by stipulation of the parties in lieu of oral testimony. Mr. Tejada was unable to reach the parents but did speak with Ms. Dorris at the ONC and several maternal relatives. Having reviewed the case, he opined that nothing in the removal, which was for E.M.'s protection, transgressed "traditional and cultural community standards." He further opined that no other services could have been provided to prevent removal and that the Department was providing continued active efforts as required by the ICWA. Finally, he concluded that return of the minor to his parents would cause the child to suffer serious emotional and/or physical damage.

The jurisdictional and dispositional hearing commenced on August 4, 2020. The juvenile court granted the ONC's formal request to intervene. The matter was then continued to August 18 to give the Department more time to receive relevant documents from Alaska. A first amended petition was filed on August 18, 2020, which clarified the allegation under subdivision (j) of section 300 to state that mother's two older children had been voluntarily placed with the maternal grandmother in 2012 after child welfare services in

8

Alaska had substantiated allegations of substance abuse and domestic violence against mother in 2010 and 2012.

At the continued hearing on August 18, 2020, Ms. Dorris appeared and stated that the ONC agreed with the Department's recommendations and court findings. Both parents submitted on the amended petition and the juvenile court sustained the allegations, finding E.M. to be a minor described by sections (b) and (j) of section 300. The juvenile court found that the Department had provided affirmative, active, thorough, and timely efforts to prevent the breakup of the Indian family, but that the efforts were unsuccessful. It also found by clear and convincing evidence that continued custody of E.M. by the parents was likely to cause serious emotional or physical damage to the child.

E.M. was adjudged a juvenile court dependent and formally removed from the custody of both parents.[3] Although the juvenile court found by clear and convincing evidence that mother was a person described by subdivision (b)(13) of section 361.5, it ordered reunification services for both parents as recommended by the Department, concluding that reunification would be in the best interests of the child. A court appointed special advocate (CASA) was appointed for E.M. The parents were advised that, given E.M.'s young age, if they failed to participate regularly and make substantive progress in court-ordered treatment, services might be terminated at the six-

---

[3] Both parents ultimately submitted to disposition. Although father had objected to the drug testing order at the August 4 hearing, the juvenile court expressed its tentative view that there was sufficient information in the reports to justify drug testing for father. The social worker reported she had offered to refer father to testing closer to his work, but he had stated he would come to San Rafael. She stated she would be happy to revisit the issue with him. At the continued hearing, father indicated he would submit and try to find drug testing closer to work.

month mark.  The court admonished both parents that if they wanted to make progress they needed to respond to calls, make appointments, and "not make everybody feel you are hiding something."  No appeal was taken by either parent.

## C.    *Contested Six-month Review*

The Department filed a six-month review report in February 2021, recommending that reunification services be terminated for both parents. Although the parents visited consistently with E.M. and the visits generally went well, neither parent had made progress on their reunification plan.  The Department had been in ongoing contact with Ms. Dorris, the tribal representative, throughout the reporting period.  The tribe had approved placement with a maternal aunt in Alaska and a permanent plan of tribal customary adoption or legal guardianship should reunification efforts fail.

Of great concern was the parents' lack of progress with their case plans and failure to respond to the Department's outreach.  The social worker only met with mother and father two times over the six-month period, on August 26, and September 29, 2020.  The parents also attended the first virtual child and family team (CFT) meeting on October 12, but missed the remaining four CFT meetings.  The social worker spoke with father about his case plan progress on October 30.  Despite numerous other attempts by the social worker to reach the parents by phone or text message, the parents were noncommunicative.  When the social worker managed to reach father on two occasions in January 2021, he put her off and then did not follow through with the planned contact.   The maternal grandmother and aunts also reported having difficulty reaching the parents, and Ms. Dorris, the tribal representative, made several attempts to contact mother without success. While father did not return the social worker's calls and messages, he kept

consistent contact with Department visitation staff regarding his visitation with E.M.

The Department provided mother with a hard copy of her case plan on August 26, 2020. On September 16, the social worker hand delivered a letter to mother which described the case plan requirements and provided referrals to three treatment programs appropriate for clients with Native American Heritage. Copies of the letter were sent to the tribe and to mother's attorney. When mother expressed interest in an Oakland recovery program, the social worker obtained a release to speak with them. The social worker learned that mother's assessment was old, and she would have to complete a new assessment with the program in order to be admitted and conveyed this information to mother. At the September 29, 2020 meeting, the social worker explained to mother the steps she would need to take to enter the program, including transferring her Medi-Cal to Alameda County, and mother said she would do so. When mother subsequently reported difficulty transferring her Medi-Cal, the social worker contacted a Marin County eligibility worker, provided mother's Oakland address, requested the Medi-Cal transfer, and told mother to follow up, which she agreed to do. At the October 12, 2020 CFT meeting, mother stated she was not yet signed up for treatment. The social worker encouraged mother to contact the Alameda County Medi-Cal office and agreed to follow up with treatment programs on mother's behalf. After their meeting, mother did not respond to the social worker's phone calls, voicemails, or text messages.[4]

---

[4] At the contested six-month hearing on March 9, 2021, mother testified that she was prepared to enter drug treatment in a program with an available bed but needed to undergo a COVID-19 test and a TB (tuberculosis) test prior to her admission.

11

As for drug testing, mother reported she was testing at her methadone clinic and did not want to drug test at two separate locations. Mother agreed to sign a release of information from her clinic but could not recall the clinic's name. The social worker attempted multiple times to obtain the name of the methadone clinic from mother, to no avail. By the September 29, 2020 meeting, mother still could not provide the name and admitted she had ceased treatment there the previous week. The social worker then explained to mother how to drug test through Quest Diagnostics and ensured that mother had the appropriate paperwork. Although the Department requested that mother drug test on multiple days from October 2020 through January 2021, it did not receive the results of any drug test.

Father was also provided with a copy of his case plan. A letter hand delivered on September 16, 2020 provided him with information on parenting classes and explained the process for drug testing. The Department also discussed the case plan with father at meetings on September 29 and October 12. The Department sent text messages to father requesting that he drug test on 16 different occasions during the reporting period. He tested only seven times, and only twice on the actual day requested by the Department. Three of father's drug tests were negative for all substances, and four were negative for alcohol but did not provide results for other substances. At the contested review hearing, the social worker testified that when father stated it was difficult for him to test on days he had visits with E.M., she no longer requested testing on visit days. She also set up the testing through Quest Diagnostics to give father more flexibility to test at different locations.

The Department referred father to virtual parenting classes on multiple occasions. Despite several calls, voicemails, and text messages, the

12

Department received no word that father ever attended the classes. At the contested hearing, the social worker testified that father never expressed concern about the timing of the parenting class or indicated he could not attend, although she explained that she could refer him to something else. Father identified his brother and sister-in-law as members of his support network. At father's request, the Department invited them and a Korean translator to CFT meetings in November, December, and January, but neither father nor his family members attended.

At the conclusion of the contested hearing, mother's attorney argued that the Department had undertaken only passive efforts to help the parents and requested that reunification services be continued. Father's counsel made similar arguments and also claimed that father had substantially complied with services. Minor's counsel argued in favor of the Department's recommendation. A newly appointed tribal representative, Ms. Peters, made a statement. After mentioning some additional services mother could participate in, she suggested that the parents be given additional reunification time. The juvenile court found that the Department had provided reasonable services and active efforts, but that the parents had failed to address the issues that led to E.M.'s removal. The court also found that it was unlikely the minor would be returned home in the next six months. The court therefore adopted the proposed orders terminating reunification services and setting the matter for a hearing pursuant to section 366.26 so that a permanent out-of-home plan could be developed for the minor. These timely petitions followed.

## II.  DISCUSSION

### A.    *Dependency Framework*

When a dependent child is removed from parental custody, "the juvenile court ordinarily must order child welfare services for the minor and the parent for the purpose of facilitating reunification of the family.  (§ 361.5, subd. (a).)  For a child under three years of age at the time of removal, as [E.M.] was, reunification services are presumptively limited to six months." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 (*Tonya M.*).)  This is because the " ' "unique developmental needs of infants and toddlers" ' [citation] justifies a greater emphasis on establishing permanency and stability earlier in the dependency process."  (*M.V. v. Superior Court* (2008) 167 Cal.App.4th 166, 175.)

As our high court has explained, for the parent of a child under three at the time of removal, the statutory scheme for providing reunification services establishes "three distinct periods and three corresponding distinct escalating standards."  (*Tonya M.*, *supra*, 42 Cal.4th at p. 845.)  In the first period—a phase from the jurisdictional hearing to the six-month review hearing where services are "presumed"—"services are afforded essentially as a matter of right."  (*Ibid.*)  In the second period—a phase from the six-month review hearing to the 12-month review hearing where services are "possible"—"a heightened showing is required to continue services."  (*Ibid.*)  Specifically, a juvenile court must continue the case to the 12-month hearing only if it finds that "there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months or that reasonable services have not been provided."  (§ 366.21, subd. (e)(3).)  In the third period—a phase from the 12-month review hearing to the 18-month review hearing where services are "disfavored"—services can be continued only under limited circumstances

and only if the juvenile court is able to make a number of very specific findings presaging reunification or if it finds that reasonable services have not been provided. (*Tonya M.*, at p. 845; see § 366.21, subd. (g)(1)(A)–(C).)

Here, we are concerned with the findings made by the juvenile court at the March 2021 six-month review. If, at such a hearing, the court finds "by clear and convincing evidence that the parent failed to participate regularly and make substantive progress in a court-ordered treatment plan," the court has the discretion to schedule a permanency planning hearing for young minors such as E.M. (§ 366.21, subd. (e)(3).) As stated above, a juvenile court must continue a case to the 12-month review if it finds that "there is a substantial probability that the child . . . may be returned to his or her parent . . . within six months or that reasonable services have not been provided." (§ 366.21, subd. (e)(3).) Moreover, when an Indian child is involved, a party seeking possible termination of parental rights must also "provide evidence to the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (§ 361.7, subd. (a).) The juvenile court's reasonable services and active efforts findings must be supported by clear and convincing evidence. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424; *In re Michael G.* (1998) 63 Cal.App.4th 700, 712.)

At the six-month hearing in this case, the juvenile court found by clear and convincing evidence that reasonable services had been provided and concluded that active efforts had been made but found that the parents failed to participate regularly and make substantive progress in court-ordered

15

treatment.[5]  The court additionally found that there was no substantial probability that E.M. might be returned to parental custody within six months.  The court therefore terminated reunification services and set the matter for a permanency planning hearing.  Both parents challenge the juvenile court's reasonable services and active efforts findings by these petitions for extraordinary writ.

## B.    *Reasonable Reunification Services and Active Efforts*

Reunification services, which play a critical role in dependency proceedings, must be tailored to the particular needs of the family.  (§ 361.5; *In re Alanna A.* (2005) 135 Cal.App.4th 555, 563; *David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 793.)  We evaluate the reasonableness of the Department's reunification efforts according to the circumstances of each case.  (*Robin V. v. Superior Court* (1995) 33 Cal.App.4th 1158, 1164.)  To support a finding that reasonable services were offered or provided, "the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult."  (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414 (*Riva M.*).)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services

_____

[5] Although the juvenile court did not clearly articulate the clear and convincing standard when finding that active efforts had been made, we presume the court correctly applied the law absent any evidence to the contrary.  (See *In re A.C.* (2017) 13 Cal.App.5th 661, 673 (*A.C.*) ["All intendments and presumptions are made to support a trial court's judgments, orders, rulings, and other actions where the record is silent, and it is the appellant's burden on appeal to show those actions are erroneous."].)

16

were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

We are also guided by the requirements of the ICWA. The ICWA implements a national policy to protect the best interests of Indian children and promote the stability and security of Indian tribes and families by establishing minimum federal standards for the removal of Indian children from their homes and the placement of these children in foster or adoptive homes which take account of the unique values of Indian culture. (*In re Isaiah W.* (2016) 1 Cal.5th 1, 7–8, citing 25 U.S.C. § 1902.) As stated above, under the ICWA and corresponding California law, "[a]ny party seeking to effect a . . . termination of parental rights[ ] to an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." (25 U.S.C. § 1912(d); § 361.7, subd. (a); see also *In re A.L.* (2015) 243 Cal.App.4th 628, 638; § 366.26. subd. (c)(2)(B)(i).)

Pursuant to state statute, "[w]hat constitutes active efforts shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe. Active efforts shall utilize the available resources of the Indian child's extended family, tribe, tribal and other Indian social service agencies, and individual Indian caregiver service providers." (§ 361.7, subd. (b).) California courts have characterized active efforts as "timely and affirmative steps . . . taken to accomplish the goal which Congress has set: to avoid the breakup of Indian families whenever possible by providing services designed to remedy problems which might lead to severance of the parent-child relationship."

17

(See *Letitia V. v. Superior Court* (2008) 81 Cal.App.4th 1009, 1016, citing cases.)

In addition, section 224.1, as amended effective January 2019, incorporates a newly adopted federal definition of "active efforts." (§ 224.1, subd. (f), as amended by Stats. 2018, ch. 833, § 3, eff. Jan. 1, 2019; 25 C.F.R. § 23.2.) Pursuant to that statute, active efforts means "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with their family. If an agency is involved in an Indian child custody proceeding, active efforts shall involve assisting the parent, parents, or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts shall be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's tribe and shall be conducted in partnership with the Indian child and the Indian child's parents, extended family members, Indian custodians, and tribe. Active efforts shall be tailored to the facts and circumstances of the case . . . ." (§ 224.1, subd. (f).)

Mirroring federal law, section 224.1 lists 11 nonexclusive examples of active efforts that may be provided in a particular case: (1) conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal; (2) identifying appropriate services and helping the parents overcome barriers, including actively assisting the parents in obtaining those services; (3) identifying, notifying, and inviting representatives of the Indian child's tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues; (4) conducting or causing to be conducted a diligent search for the

18

Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents; (5) offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's tribe; (6) taking steps to keep siblings together whenever possible; (7) supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child; (8) identifying community resources including housing, financial assistance, transportation, mental health and substance abuse services, and peer support services, and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources; (9) monitoring progress and participation in services; (10) considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available; and (11) providing postreunification services and monitoring. (See § 224.1, subd. (f); 25 C.F.R. 23.2.)

We review the juvenile court's active efforts and reasonable services factual findings for substantial evidence. (*C.F. v. Superior Court* (2014) 230 Cal.App.4th 227, 239 (*C.F.*).) "The issue of sufficiency of the evidence in dependency cases is governed by the same rules that apply to all appeals. If, on the entire record, there is substantial evidence to support the findings of the juvenile court, we uphold those findings. [Citation.] We do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence or evaluate the weight of the evidence. Rather, we draw all reasonable inferences in support of the findings, view the record most favorably to the

juvenile court's order, and affirm the order even if other evidence supports a contrary conclusion." (*In re Megan S.* (2002) 104 Cal.App.4th 247, 250–251; see *Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 688–689.) "[W]hen presented with a challenge to the sufficiency of the evidence associated with a finding requiring clear and convincing evidence, [we] must determine whether the record, viewed as a whole, contains substantial evidence from which a reasonable trier of fact could have made the finding of high probability demanded by this standard of proof." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1005.) A petitioner in this court bears the burden of establishing that the juvenile court's findings were not adequately supported. (*Megan S.*, at p. 251.)

California precedent has long held that "the standards for determining whether active efforts were made are 'essentially undifferentiable' from those for assessing whether reasonable services under state law were provided." (*C.F.*, *supra*, 230 Cal.App.4th at p. 239, citing *In re Michael G.*, *supra*, 63 Cal.App.4th at p. 714.) Here, however, both parents assert that newly enacted section 224.1, subdivision (f), and the underlying federal regulation on which it is based, imposes an "active efforts" obligation that exceeds the existing reasonable services standard. We need not resolve the parents' contention as we have no difficulty concluding on this record that substantial evidence supports both the juvenile court's reasonable services finding and its finding that active efforts were made to prevent the breakup of this Indian family.

## C.      *Substantial Evidence Supports the Court's Findings*

We conclude that ample evidence supports the juvenile court's finding that reasonable services were offered or provided to both mother and father in this case. As stated above, to support a reasonable services finding "the

record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained *reasonable* contact with the parents during the course of the service plan, and made *reasonable* efforts to assist the parents in areas where compliance proved difficult." (*Riva M.*, *supra*, 235 Cal.App.3d at p. 414.)  As our recitation of the facts makes clear, the Department conducted a thorough investigation in this case, responding to and investigating the two referrals and obtaining family information from the maternal relatives, Alaska and Hawaii child welfare departments, and mother's tribe.  The information collected revealed mother's long-term substance abuse problem and father's repeated failure to keep his very young child safe.  It also disclosed the possibility that father was not always truthful and might, himself, be involved in drug use or sales.  Under these circumstances, the services offered to the parents were clearly designed to remedy the problems presented.  Furthermore, the social worker's dogged efforts to keep in contact with the parents and assist them with plan compliance were more than reasonable and were hampered only by the parents' failure to communicate with the Department.

Although father complains that the social worker failed to refer him to a parenting class that worked with his schedule, the social worker testified that she told father she could refer him to a different class if necessary, but he never indicated there was a problem.  Father also complains that the social worker should have lessened the drug testing requirement given his demanding work schedule, should have observed more than one visit with the minor, and should have referred him to conjoint counseling, therapy, and/or a support group for those living with an addict.  Further observation of the parents' visits with E.M. was unnecessary, however, because the visits were

21

positive, other staff adequately reported on the interactions, and the social worker did not want to disrupt the parent-child dynamic during visits any more than was necessary.

As for drug testing, the social worker tried to make this requirement as flexible as possible, and we disagree with father that he had adequately established his sobriety with the few tests he did take. The juvenile court expressly rejected father's excuses for failing to engage in services. Finally, the social worker explained that counseling was not initially ordered in the case because the focus was on ensuring E.M.'s safety. Moreover, the parents' failure to remain in contact with the Department and engage in the services already provided hampered the provision of services. As the social worker explained, she never got to the point where she could reevaluate and determine whether additional services might be beneficial to the parents.

For the same reasons, we reject mother's complaint that services were unreasonable due to the social worker's failure to observe more visits or refer the parents to therapy. Mother's other claim—that the social worker did little to provide adequate referrals and support with respect to entering residential treatment—is belied by the record. When mother identified a treatment program she was interested in, the social worker obtained a release from mother, spoke to the program to see what steps mother needed to take for admission, explained those steps to mother, and contacted the eligibility worker directly when mother reported difficulty transferring her Medi-Cal. Yet mother failed to follow through or respond to the social worker's phone calls, voicemails, and text messages. As the Department observed in the proceedings below, the parents "participated in the elements of the case that they wanted to participate in, and they did not participate in the elements of the case that they didn't want to participate in." The parents'

22

inability to participate in the services offered does not reflect a failure of the Department to offer or provide reasonable services.

The evidence regarding the Department's active efforts in this case is arguably more compelling. As discussed above, the Department conducted a comprehensive assessment of the circumstances of the Indian child's family, even without the parents' cooperation, and recommended reunification efforts for mother despite the fact that her history made her presumptively ineligible. (§ 224.1, subd. (f)(1).) The Department then identified appropriate services and attempted to assist the parents in obtaining those services, again to the extent it was able to do so given the parents' refusal to communicate and engage. (*Id.*, subd. (f)(2) & (8).) The Department immediately contacted the ONC when it learned of mother's Indian heritage and involved the tribe throughout the case. (*Id.*, subd. (f)(3).) It contacted and consulted with E.M.'s extended Indian family members to provide support for the minor and his parents. (*Id.*, subd. (f)(4).) It offered culturally appropriate services. (*Id.*, subd. (f)(5).) It supported regular visitation not only with the parents but with E.M.'s extended Indian family. (*Id.*, subd. (f)(7).) Finally, the Department monitored the parents' progress and participation in services to the extent permitted by the parents. (*Id.*, subd. (f)(9).) As the juvenile court observed after going through a similar analysis, it could not "see where [the social worker] fell below providing active efforts." We agree.

In characterizing the Department's efforts as passive rather than active, the parents raise many of the same arguments we rejected above concerning the provision of reasonable services. Their arguments fare no better through the lens of the ICWA. As one court has described it: " 'Passive efforts are where a plan is drawn up and the client must develop

his or her own resources towards bringing it to fruition.  Active efforts . . . [are] where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own." (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1286.)  It is abundantly clear that the Department did more in this case than merely draw up a reunification plan and leave the parents to use their own resources to bring it to fruition.  We see no error in the juvenile court's reasonable services and active efforts findings.[6]

## III.  DISPOSITION

The petitions are denied on the merits.  (See § 366.26, subds. (*l*)(1)(C), (*l*)(4)(B).)  Because the permanency planning hearing in this matter is set for July 6, 2021, this opinion is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

---

[6] In parts of her writ petition, mother appears to argue in passing that, even if sufficient services were provided, the court nevertheless abused its discretion in ordering a permanency planning hearing in this case.  Since mother failed to support this claim with reasoned argument and citations to authority, she has forfeited it.  (*A.C.*, *supra*, 13 Cal.App.5th at p. 672.)  Regardless, we see no abuse of discretion.

SANCHEZ, J.

WE CONCUR:

HUMES, P. J.

BANKE, J.

A162235
*J.M. v. Superior Court*

25